

# In the
# Missouri Court of Appeals
## Western District

SAVE-A-CONNIE, INC.,
D/B/A AIRLINE HISTORY MUSEUM,

    Appellant,

    v.

EXECUTIVE BEECHCRAFT, INC.
AND THE CITY OF KANSAS CITY,
MISSOURI,

    Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

WD85355

OPINION FILED:

MAY 23, 2023

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable K. Elizabeth Davis, Judge**

**Before Division Two: Alok Ahuja, Presiding Judge, Anthony Rex Gabbert, Judge,**
**Thomas N. Chapman, Judge**

Save a Connie, Inc., d/b/a Airline History Museum ("Museum"), appeals the circuit court's Judgment dated March 21, 2022, which found in favor of Executive Beechcraft, Inc. ("Executive") on Museum's First Amended Petition for Declaratory Judgment and Damages, and in favor of Executive on Executive's counterclaim. Museum argues that the circuit court erred in concluding that the Sublease Agreement between Museum and Executive survived termination of the 1973 Master Lease. Museum additionally appeals the circuit court's July 31, 2020 Order of Dismissal which dismissed Museum's First Amended Petition as to the City of Kansas City, Missouri (the "City") for lack of standing. Museum argues that the circuit court erred in finding that

Museum was not a third-party vested donee beneficiary and lacked standing to sue. We affirm.

## Factual and Procedural Background

The relevant facts are not in dispute. The City is a municipal corporation of the State of Missouri which operates and maintains an airport known as Charles B. Wheeler Downtown Airport located in Clay County, Missouri (the "Airport"). Since the early 1970s, Executive or its predecessors have leased certain ground and improvements at the Airport from the City pursuant to a Fixed Based Operations and Lease Agreement.

Executive subleased certain land on the west side of the Airport (the "Premises") to Museum through a Sublease Agreement dated June 5, 2000. (the "Sublease"). Museum operates an airline museum at the Airport on that land. The initial term of the Sublease was five years or until 2005, with three additional five-year options. For the first five years of the Sublease, Museum was to pay $14,000 per month in rent.

The initial lease between the City and Executive was created in 1973 and amended thereafter. In 2005, the City and Executive created a new lease. (the "Master Lease of 2005"). The Master Lease of 2005 provides that all prior leases, including the Master Lease of 1973, are cancelled, and the terms of the Master Lease of 2005 began January 1, 2006, for a term of thirty years, ending on December 31, 2035.

The Master Lease of 2005 between the City and Executive also provides, in part:

**Sec. 2.5. Airline Museum.** As identified at Parcel D and set forth in Exhibit "B", the Hanger leased to the Airline Museum shall be leased to Lessee at the reduced ground (improved and unimproved) and building

2

rental rates set forth in Exhibit "B" for as long as it remains a non-profit airline museum. The Rent for the Airline Museum shall be adjusted annually as set forth in Sec. 2.2 Adjustments to Rent Above.

In an undated letter to Executive, Museum gave written notification that it wished to "exercise the option at this time to renew the subject sublease for the first of the three additional five-year terms provided for in the sublease agreement." By letter dated January 12, 2006, Executive acknowledged Museum's exercise of the first of its three five-year extensions under the Sublease.

In 2009, Executive and Museum executed a "Second Amendment to Sublease Agreement," replacing Section Five "Rent" of the Sublease and establishing a "Rental Discount Period." The "Rental Discount Period" required Executive to charge $0.00 per month for rent for certain portions of the Premises. The 2009 amendment to the Sublease provided that either party could terminate the Rental Discount Period without cause upon thirty days written notice. It also provided that, "In no event shall any Rental Discount Period exceed the existing term or any renewal term of the Sublease."

Only the 2009 amendment to the Master Lease of 2005 discusses the zero-rent rate. Other rates were in effect prior to that time. Effective January 1, 2006, Executive was charged $1,344.37 monthly rent by the City for the Premises subleased by Museum; effective January 1, 2007, Executive was charged $1,365.88 monthly rent by the City for the Premises subleased by Museum; effective January 1, 2008, Executive was charged $1,406.85 monthly rent by the City for the Premises subleased by Museum; effective June 1, 2009, Executive was charged $0.00 monthly rent by the City for the Premises

3

subleased by Museum, with the "Building and Ground rents for the Airline History Museum [] abated so long as it is a non-profit aviation-history facility." This provision in the Master Lease of 2005, as amended, further provides that, in the event the Building and Ground for Parcel D-2 are no longer used as a non-profit aviation-history facility, the building rates would adjust to fair market rental value and ground rates would comport with rates for other facilities under the Lease.

By memo dated December 11, 2009, Museum issued its "Notice of Intent to Renew" to Executive whereby it stated that "it intends to renew its Sublease of the premises … and extend the Rental Discount Period as described in the Second Amendment to the Sublease Agreement." The notice further stated that, "All other terms and conditions of the Sublease and the First Amendment to the Sublease shall remain in full force and effect."

By letter dated July 8, 2010, Museum notified Executive that "Pursuant to the Sublease Agreement … and amendments thereto" it was exercising the second of its three five-year renewals under the Sublease, extending the Sublease from January 1, 2011 to December 31, 2015. Further, that "All other terms and conditions of the Sublease and all Amendments to the Sublease shall remain in full force and effect."

On July 30, 2010, the City and Executive executed a Second Amendment to the Master Lease which amended Exhibit B to the Master Lease "to reflect $0.00 annual Building and Ground Rent so long as Parcel D-2 is a non-profit Airline History Museum as authorized by the Federal Registry." The Second Amendment was effective retroactive

4

to June 1, 2009, which aligned the Master Lease rent owed by Executive to the City with the terms of the 2009 amendment to the Sublease as to rent owed by Museum to Executive.

By letter dated April 2, 2014, Museum notified Executive that it was exercising the "3rd and final" 5-year renewal period, and "All other terms and conditions of the Sublease dated, June 5, 2000, [and amendments thereafter] shall remain in full force and effect." Museum further stated in the letter:

> There is no clear designation as to a renewal date identified in the Sublease. Given the date of June 5, 2005 in the original sublease and the renewal intervals established in the First Amendment, we hereby give notice that the lease renewal shall extend the sublease of Save A Connie, Inc. to December 31, 2020.

On June 19, 2019, Museum filed a Petition for Declaratory Judgment and Damages against Executive alleging that, as a third-party donee vested beneficiary, Executive and the City were bound to the Master Lease of 2005 between the City and requested a declaration that Museum's lease expiration be based on the Master Lease of 2005's expiration of December 31, 2035.

On September 9, 2019, the Sixth Amendment to the Master Lease deleted **"Sec. 2.5 Airline Museum"** in its entirety, effective December 1, 2019. By letter dated September 27, 2019, Executive notified Museum that it was terminating the Rental Discount Period effective October 31, 2019, and starting on or about December 1, 2019, Executive would pass along to Museum the rent the City charged Executive. Beginning

in December 2019, Executive sent monthly invoices in the amount of $3,256.02 to Museum for rent owed by Museum. Museum did not pay any of the invoices.

On December 31, 2019, Museum filed its First Amended Petition for Declaratory Judgment and Damages against Executive and the City. In Count I, Museum asked for a declaration that Museum's lease designation be "per the Master Lease and that the lease expires on December 31, 2035," and for a determination of the exact location of the leased premises. In Count II, Museum sought damages alleging that Executive incorrectly charged, and Museum incorrectly paid, rent in the sum of $61,500, and that Executive wrongfully refused to allow Museum to use the leased property to display a DC-8 aircraft resulting in damages in excess of $100,000. In Count III, Museum alleged that it was a Donee Third Party of the Master Lease and requested the court define it as such and invalidate the Sixth Amendment to the Master Lease which eliminated the prior no rent provision.

On January 10, 2020, Executive answered Museum's First Amended Petition and counterclaimed seeking judgment for unpaid rent and utilities, termination of the Sublease, and possession of the Premises.

On February 27, 2020, the City filed a motion to Dismiss Museum's First Amended Petition. On July 31, 2020, the circuit court granted the City's Motion to Dismiss and dismissed the City from Museum's lawsuit finding, a) Museum was not a party to the Master Lease between the City and Executive, and b) Museum was not a

6

third-party beneficiary to the Master Lease. These findings resolved Count III of Museum's First Amended Petition.

On September 11, 2020, Executive moved for partial summary judgment to find that the termination date of the Sublease was December 31, 2020, and not 2035 as alleged in Count I of Museum's First Amended Petition.

On December 1, 2020, the circuit court entered an Order granting Executive's Motion for Partial Summary Judgment as to Count I of Museum's First Amended Petition, finding the "termination of the Sublease between Plaintiff and [Executive] is December 31, 2020."

By letter dated December 3, 2020, Executive provided notice to Museum that the Sublease would terminate on December 31, 2020, and Museum was to vacate and return the Premises in substantially the same condition as existed at the beginning of the Sublease. Museum did not vacate the Premises.

On three occasions in 2019 and 2020, the City made demand upon Museum and Executive for the payment of utilities and advised that, if payment was not made within thirty days, the City would declare default under the Master Lease of 2005. Invoices addressed to Museum from the Kansas City Aviation Department provided that Museum owed specific sums for utilities used by Museum in September 2018 through December

7

2020. Museum made no payments, and Executive ultimately satisfied the invoices after Museum failed to do so.[1]

On February 10, 2021, Executive filed another Motion for Summary Judgment requesting judgment as to: (i) Museum's remaining claim in Count I requesting determination of the square footage of the Premises; (ii) Museum's Count II claim that it incorrectly paid $61,500 in rent; (iii) Museum's Count II claim that it incurred damages by Executive's refusal in 2014 to allow a DC-8 to be displayed; and (iv) Executive's counterclaim for unpaid rent and utilities and possession of the Premises. On August 20, 2021, the circuit court granted summary judgment to Executive as to Count I, denied summary judgment as to Count II, and denied Museum's request for declaratory judgment against Executive.

The remaining claims went to trial December 3, 2021. Museum conceded at trial that the statute of limitations expired on its Count II claim for incorrectly paid rent. On March 21, 2022, the circuit court entered Final Judgment in the matter. The court dismissed Museum's $61,500 unjust enrichment claim with prejudice and granted judgment in favor of Executive and against Museum on Museum's claim in Count II that it was damaged due to Executive's refusal to allow a DC-8 aircraft to be displayed. As to

---

[1] The Master Lease of 2005 provides that utility services required by Executive during the term of the Master Lease of 2005 for the premises "must be obtained and maintained by [Executive] at its own expense." The Master Lease of 2005 provides that Executive's failure to pay "rent, charges or any other payments of money required by [Executive]" constitutes a default by Executive under the Master Lease. Section Six of the Sublease requires Museum to pay for utilities used by Museum during the term of the Sublease.

Executive's counterclaim, the circuit court granted judgment in favor of Executive and against Museum in the amount of $42,328.26 for unpaid rent from December 2019 to December 2020; in the amount of $78,144.48 for unpaid double rent from January 2021 through December 2021 (finding Museum was a holdover tenant), with rent accruing at the rate of $6,512.04 each month thereafter until Museum vacated the Premises; and in the amount of $19,226.40 for utilities Executive paid to the City on behalf of Museum from September 2018 to October 2021.  The court entered judgment in favor of Executive and against Museum for any utility bills Executive paid to the City on Museum's behalf for utilities used by Museum in the Premises after October 2021 until Museum vacated the Premises.  Judgment for immediate possession and restitution of the Premises was granted to Executive.  Court costs were assessed against Museum.

This appeal follows.

**Standard of Review**

Museum's first point on appeal challenges the grant of a motion for summary judgment.  The standard of review for an appeal challenging the grant of a motion for summary judgment is *de novo*.  *ITT Com. Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).  In such cases, we do not defer to the trial court's decision, but instead use the same criteria that the trial court should have employed in initially deciding whether to grant the motion.  *Barekman v. City of Republic*, 232 S.W.3d 675, 677 (Mo. App. 2007).  We review the record in the light most favorable to the party against whom judgment was entered, and accord that party the

9

benefit of all inferences which may reasonably be drawn from the record. *Id.* Summary judgment is appropriate where the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law. *ITT Com. Fin. Corp.*, 854 S.W.2d at 376. A genuine issue that will prevent summary judgment exists where the record shows two plausible, but contradictory, accounts of the essential facts and the genuine issue is real, not merely argumentative, imaginary, or frivolous. *Id.* at 382. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.* at 376. The moving party bears "the burden of establishing a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment." *Id.* at 378.

Museum's second point on appeal challenges the court's dismissal of Museum's First Amended Petition as against the City on the grounds that Museum was not a party to the Master Lease of 2005 and, therefore, had no standing to sue. The standard of review for an appeal from a dismissal for lack of standing is *de novo*. *Corozzo v. Wal-Mart Stores, Inc.*, 531 S.W.3d 566, 572 (Mo. App. 2017). We determine standing as a matter of law on the basis of the petition, along with any other uncontested facts accepted as true by the parties at the time the motion to dismiss was argued. *Id.* "We construe the pleadings liberally and accept all alleged facts as true and construe them in a light most favorable to the pleader." *Id.* We resolve the issue as a matter of law on the basis of the

10

undisputed facts. *Id.* As the party seeking relief, Museum bore the burden of establishing standing. *Id.*

## Point I – Sublease Termination Date

In Museum's first point on appeal, Museum contends the circuit court erred in concluding that the Sublease Agreement between Museum and Executive survived termination of the 1973 Master Lease to which the Sublease Agreement was subject. Museum argues that the 1973 Master Lease was terminated by the Master Lease of 2005, in that the Master Lease of 2005 provided that all prior leases, specifically mentioning the Master Lease of 1973 which provided for Museum's leasehold, were cancelled, and the term of the Master Lease of 2005 is January 1, 2006 to December 31, 2035.

The Sublease Agreement between Executive and Museum states as follows regarding the Master Lease of 1973:

> The parties to this sublease hereby agree that the terms of this sublease shall be subject and subordinate to the terms and conditions of the Master Lease. Any terms of this sublease that conflict with the Master Lease or that are inconsistent with the terms of the Master Lease between the Lessor and the City of Kansas City, Missouri shall be controlled by the terms of said Master Lease. This sublease is effective and binding on the parties hereto only after it has been approved by the Aviation Department of Kansas City, Missouri, which approval it shall be Lessor's obligation to obtain.

Museum argues that the aforementioned language shows that the Sublease Agreement had no life of its own and expired upon the execution of the Master Lease of 2005 which states: "WHEREAS, City and Lessee desire to cancel the Prior Leases and provide this new Lease to govern the lease of premises at the Airport and the terms and conditions

11

thereof." The Master Lease of 2005 States in Sec. 1.2 regarding its "Term of Lease" that, "This Lease will begin on January 1, 2006 ("Commencement Date") for a term of thirty years, ending on December 1, 2035. Any Prior Leases between City and Lessee are canceled effective on the Commencement Date of this Lease." Museum contends that the expiration term of the Master Lease of 2005 is applicable to Museum's lease of the Premises. We disagree.

The plain language of the Master Lease of 2005 discusses only leases between the City and Executive, and therefore terminates only leases between the City and Executive. "Lease" is defined in the Master Lease of 2005 as including "any and all *City of Kansas City, Missouri, Aviation Department contracts*, agreements, leases, licenses, permits, or other documents, however denominated that grant or convey a right or privilege on an Airport, and to which this Exhibit is annexed and made a part thereof." (Emphasis added). The Sublease was not a City lease; it was a contract between Executive and Museum. Museum acknowledges that its rights to the Premises stemmed from a sublease, and not an assignment.

> The difference between an assignment and a sublease is significant. In the former, the lessee parts with his whole term or interest as lessee and retains no reversionary interest in the original lease. On the other hand, if there remains a reversionary interest in the estate conveyed, however small, the arrangement is a sublease. If the transaction is an assignment, the assignee of a lease succeeds to all the interest of the lessee and to the benefit of all the covenants and agreements of the lessor which are annexed to and run with the leasehold estate, whereas the sublessee does not acquire any right to enforce the covenants or agreements of the lessor contained in the original lease. The sublessee's rights depend on the covenants or agreements in his sublease. Furthermore, the assignee is liable directly to

12

> the original lessor on all covenants in the original lease which run with the land, including the covenant to pay rent.

*Siragusa v. Park*, 913 S.W.2d 915, 917 (Mo. App. 1996) (internal quotation marks and citations omitted).

Museum seeks to avoid this reality by arguing, without any support in the language of the Master Lease of 2005, that the Master Lease of 2005 terminated the Sublease and essentially substituted Museum for Executive with regard to the Premises subleased by Museum. But the plain language of the Master Lease of 2005 acknowledges the Sublease between Museum and Executive in "Sec. 2.5. Airline Museum" in stating that "the Hangar *leased to* the Airline Museum *shall be leased to Lessee* at the reduced ground (improved and unimproved) and building rental rates set forth in Exhibit "B" for as long as it remains a non-profit airline museum." (Emphasis added). The "Lessee" in the Master Lease of 2005 is "Executive Beechcraft, Inc." The hangar, therefore, was leased by the City to Executive, not Museum, at reduced rates for as long as the hangar remained a non-profit airline museum.

Although Museum argues that its right as a subtenant to possession of the premises terminated with the execution of the Master Lease of 2005 between City and Executive, and that the Master Lease of 2005 "constituted a brand-new agreement between the parties," Museum fails to explain how it acquired Executive's interest in the Master Lease of 2005 without being a party to that contract and without a sublease or assignment from Executive. Museum also fails to explain why, if the Sublease was terminated by the

13

Master Lease of 2005, Museum expressly renewed the Sublease in 2006 by exercising the first of its three five-year extensions under the Sublease; executed an amendment to the Sublease in 2009; expressly renewed the Sublease in 2010 by exercising the second of its three five-year extensions under the Sublease; and expressly renewed the Sublease in 2014 by exercising the last of its three five-year extensions under the Sublease and stating within that renewal that the final extension would end December 31, 2020.  Additionally, there is nothing within the Master Lease of 2005 or the Sublease that suggests that the termination date of the Sublease coincides with the termination date of the Master Lease.

The circuit court did not err in concluding that the termination date of the Sublease between Museum and Executive was December 31, 2020.

Museum's first point on appeal is denied.

### Point II – Third-Party Donee Beneficiary

In its second point on appeal, Museum contends the circuit court erred in finding Museum was not a third-party vested donee beneficiary arguing that, although not in privity to the Master Lease of 2005 between the City and Executive, the Master Lease of 2005 contains a promise to Museum and created a duty in the City and Executive due to Museum.  Specifically, Museum argues:

> The Master Lease of 2005 was entered into for the purpose of creating a leasehold between Respondent City and Respondent [Executive] whereby Respondent City leased to Respondent [Executive] real property – i.e., the Airport.  However, as expressly provided in the Master Lease of 2005, a second purpose of the Master Lease of 2005 was to 'govern the lease of premises at the Airport and the terms and conditions thereof,' which directly related to [Museum] and [Museum's] use and subleasing of

14

the Airport. Therefore, [Museum] was, in fact, a donee beneficiary who received, and accepted, the 'gift' of subleasing rights to the Airport for the purpose of operating a non-profit airline history museum.

As a third-party beneficiary to the Master Lease of 2005, [Museum] has the right to independently enforce the contract.

The City and Executive argue that, 1) there is no third-party beneficiary standing to sue a municipality in contract, as such would conflict with Section 432.070, RSMo. 2016, 2) Missouri Constitution art. VI, §§ 23, 25 prohibits cities from making gifts to private entities, and as such, Museum cannot be a third-party donee beneficiary, and 3) even if Museum could qualify as a third-party donee beneficiary, Museum has no standing to sue under the Master Lease of 2005 because the right to enforce the contract must be directly expressed.

In response, and despite claiming in its initial brief that Museum received the gift of subleasing rights to the Airport, Museum argues in its reply brief that, "Respondent City made no gift to [Museum]; rather, it exercised its civic function (a museum) and required their vendor, [Executive], to provide the space in the Downtown Airport to [Museum] for free, as a condition of Respondent City leasing, for a fee, the Downtown Airport to [Executive] as a civic responsibility." Museum further states that neither Executive nor the City presented any evidence that City "intended any gift to [Museum] under the Sublease Agreement and/or the Master Lease of 2005."

We find Museum's positions conflicting and difficult to reconcile. In its first point on appeal, Museum argues that its Sublease with Executive was cancelled by the Master

15

Lease of 2005. In its second point, Museum argues that it was gifted "subleasing rights" to the airport in the Master Lease of 2005, but desires to acquire the termination date of the Master Lease pursuant to this right and deny the applicability of the express terms of the actual Sublease. In its reply brief, and apparently in response to the Respondents' argument that the City was constitutionally barred from gifting anything to Museum, Museum argues that the City made no gift at all to Museum but instead required Executive to allow Museum to conduct its business on City property free of charge in exchange for Executive being allowed to lease property from the City.

Even considering Museum's conflicting arguments, we simply find no support in the record for Museum's contention that the Master Lease of 2005 conferred donee third-party beneficiary status on Museum.

> There are three types of third-party beneficiaries: donee, creditor, and incidental. Donee and creditor beneficiaries may maintain actions and recover under a contract, while incidental beneficiaries may not.
>
> A donee third-party beneficiary exists when the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed nor asserted to be due from the promisee to the beneficiary. A creditor beneficiary is one upon whom the promisee intends to confer the benefit of the performance of the promisee's contract with the promisor and thereby discharge an obligation or duty the promisee owes the beneficiary. In contrast, an incidental beneficiary is one who will benefit from the performance of a promise but who is neither a promisee nor an intended beneficiary.

*Kansas City Hispanic Ass'n Contractors Enterprise, Inc. v. City of Kansas City*, 279 S.W.3d 551, 555 (Mo. App. 2009) (internal quotation marks and citations omitted). "A

party claiming rights as a third-party beneficiary has the burden of showing that provisions in the contract were intended for his direct benefit. The contract rights are only enforceable if the promisor assumed a direct obligation to the third-party beneficiary." *Id.*

Museum fails to explain how the provisions of the Master Lease of 2005 reveal an intent to directly benefit Museum, or show that the City assumed a direct obligation to Museum. Museum argues that the language within the Master Lease of 2005 that confers donee third-party beneficiary status is the statement that the purpose of the lease is to "govern the lease of the premises at the Airport and the terms and conditions thereof." Yet, this is very generic language that states nothing specific with regard to Museum, and Museum concedes that it is not a party to the Master Lease of 2005. As discussed under Museum's first point on appeal, the Master Lease of 2005 recognizes that the Premises were already being subleased to Museum by Executive and provides in "Sec. 2.5. Airline Museum" that "the Hangar *leased to* the Airline Museum *shall be leased to Lessee* at the reduced ground (improved and unimproved) and building rental rates set forth in Exhibit "B" for as long as it remains a non-profit airline museum." (Emphasis added). The "Lessee" in the Master Lease of 2005 is "Executive Beechcraft, Inc.", and the hangar is leased to Executive at reduced rates for as long as the hangar remains a non-profit airline museum. Moreover, the Master Lease of 2005 acknowledges and honors the existence of the Sublease and its terms but changes nothing with regard to the Sublease.

The record shows that the Sublease was amended to reflect the zero-rent rate between Museum and Executive *before* the Master Lease of 2005 was amended to reflect the zero-rent rate between the City and Executive. The terms of the Sublease expressly state that the Premises are being subleased for the sole purpose of its use as an airline history museum. The Master Lease of 2005 recognizes the terms of the Sublease by leasing the hangar to Executive under the rates set forth thereunder "for as long as it remains a non-profit airline museum."

Only the 2009 amendment to the Master Lease of 2005 discusses the zero-rent rate. Other rates were in effect prior to that time. Effective June 1, 2009, Executive was charged $0.00 monthly rent by the City for the Premises subleased by Museum, with the "Building and Ground rents for the Airline History Museum [] abated so long as it is a non-profit aviation-history facility." This provision in the Master Lease of 2005, as amended, further provides that, in the event the Building and Ground for Parcel D-2 are no longer used as a non-profit aviation-history facility, the building rates would adjust to fair market rental value and ground rates would comport with rates for other facilities under the Lease. Moreover, nothing within the Master Lease of 2005 *requires* Executive to lease the Premises to a nonprofit airline museum at all, much less to Museum, but provides for reduced rent *to Executive* if it chooses to do so. Certainly nothing within the Master Lease of 2005 suggests that the City requires Executive to provide the Premises to Museum rent free through the expiration of the Master Lease of 2005.

18

The circuit court did not err in finding Museum was not a third-party vested donee beneficiary under the Master Lease of 2005, as the Master Lease of 2005 simply recognizes the existence of the Sublease between Museum and Executive but makes no promises to Museum. Further, nothing within the Master Lease of 2005 shows that the purpose of the Master Lease of 2005 was for Executive to provide the Premises to Museum rent free through the expiration of the Master Lease of 2005.

Museum's second point on appeal is denied.

## Conclusion

The circuit court's Judgment dated March 21, 2022, which found in favor of Executive on Museum's First Amended Petition and Executive's counterclaims, is affirmed. The circuit court's Order of Dismissal dated July 31, 2020, which dismissed Museum's petition as to the City, is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.

19